**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HALE KNOX, individually, and on behalf of himself and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHOBANI, LLC,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Plaintiff Hale Knox ("Plaintiff") by and through his counsel, bring this class action against Defendant Chobani, LLC ("Defendant" or "Chobani") to seek redress for its unlawful and deceptive practices in labeling and marketing the protein content in its consumer yogurt food products.

2.      Consumers are more than ever interested in maximizing their protein intake, which provides a variety of known positive health impacts.  In recent years, 20 grams of protein per serving has become a crucial threshold driving consumer purchase interest across a broad range of food and beverage categories – including yogurt.

3.      Chobani knows consumers are mindful of the amount and number of grams of protein they consume per serving and that protein content is a material driver in the purchase of yogurt products promoting protein. Thus, in 2024, Chobani introduced a line of yogurt products called "20G Protein", including a 32-ounce size ("the Products" or "Chobani Yogurt"). Chobani acknowledged the importance of the 20-grams-per-serving protein threshold by using it in the Chobani Yogurt's very name, and by featuring that claim prominently in the product's labeling and

1

advertising.

4.      Consumers, in turn, reasonably expect that the Chobani Yogurt will actually provide 20 grams of protein per serving as stated on the Product package. However, as detailed herein, Defendant misrepresents the true protein amount per serving on each of the Chobani Yogurt products sold to Consumers.

5.      Chobani sells the Chobani Yogurt in both single-serving and multiple-serving 32-ounce containers or tubs.

6.      When it comes to single-serving containers, the U.S. Food and Drug Administration ("FDA") grants food manufacturers some discretion in determining the size of a "serving." Nonetheless, the yogurt industry has long regarded 5.3 ounces as the standard size for a single-serving container of Greek-style yogurt.  For years, Chobani has sold (and still sells) its own flagship Greek yogurt product in single-serving units containing 5.3 ounces of yogurt.  Chobani's competitors, including Danone US, FAGE, Ratio, Cabot, siggi's and Wallaby all sell their own single-serving yogurt products, in 5.3-ounce containers.

7.      The problem for Chobani is that, while 5.3 ounces of other ultra-high-protein yogurt products contain 20 grams of protein, 5.3 ounces of the Chobani Product falls well short of that critical threshold.  Chobani therefore designed its single-serving containers of the Chobani Yogurt to hold 6.7 ounces of yogurt – more than the industry standard of 5.3 ounces, but just enough to provide 20 grams of protein.  That conduct is not the focus of this lawsuit – although it does highlight the importance of the 20-grams-per-serving threshold to consumer purchase decisions as well as Chobani's efforts to confuse consumers.

8.      When it comes to multiple-serving tubs, however, Chobani engages in blatant misrepresentation and violates FDA regulations.

9.    Unlike single-serving containers, multiple-serving containers are subject to strict FDA rules governing the calculation of serving sizes.

10.    If Chobani followed FDA's serving size rules for multiple-serving containers, the multiple-serving Chobani Yogurt would be able to claim only 18 grams of protein per serving – well below the critical 20-gram threshold. To justify the "20 grams" claim in its product's name, labeling and advertising, Chobani significantly inflates the size of each "serving" of the Chobani Yogurt. Here, however, unlike in the single-serving context, Chobani does not actually increase the amount of yogurt in the container. And unlike in the single-serving context, this conduct is flatly prohibited by FDA regulations.

11.    Chobani engages in this conduct with full knowledge that consumers want to consume more protein but have substantial "gaps" in nutritional understanding – such that they are likely to be fooled by Chobani's ploy. In fact, according to Chobani's own research, 85% of consumers "want[] to increase their protein intake," and 74% of consumers "prioritize[e]…[the] amount of protein…per serving" when selecting foods – even though a quarter of consumers "admit[] they don't know the right amount" of protein to consume.[1]

12.    Consumers reasonably expect that Chobani will actually display the true and correct amount of protein per serving on the Chobani Yogurt's labels, packaging and advertising. But Chobani's Yogurt does not do so. Had Chobani included statements of the accurate amount of protein per serving as it was required to do under the law, it would have revealed that the Chobani Yogurt contains significantly less protein per serving than represented. That information is material to reasonable consumers.

---

[1] Chobani, *Americans Are Prioritizing Protein Now More Than Ever, but Study Shows Significant Gaps in Nutrition Knowledge* (Dec. 4, 2024), https://www.chobani.com/newsroom/our-news/americans-are-prioritizing-potein-now-more-than-ever-but-study-shows-significant-gaps-in-nutrition-knowledge

13. Defendant's unlawful and misleading protein claims caused Plaintiff and members of the Class to pay a price premium for the Chobani Yogurt.

## PARTIES

14. Plaintiff Hale Knox is an individual domiciled in New York, New York.

15. Defendant Chobani is a limited liability company organized under Delaware law and markets and sells Chobani yogurt from its global headquarters located at 200 Lafayette Street, New York, New York 10013.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs and at least one member of the plaintiff class is a member of a different state as the Defendant.

17. A significant portion of the injuries, damages, and/or harm upon which this action is based occurred or arose out of the activities engaged in by Defendant within, affecting and emanating from, the State of New York. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of New York. Defendant is domiciled and engaged, and continues to engage, in substantial and continuous business practices in the State of New York.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of New York, including within this District.

19. Plaintiffs accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A.  High-Protein Market Demand

20.    The food and beverage industry is undergoing a transformational change. Consumers have "proteinmania,"[2] with analysts calling demand for dietary protein the "trend of the decade."[3]  The percentage of Americans trying to consume protein has reportedly increased from 59% in 2022, to 70% in 2025, and now to 75% as of late February 2026.[4]  A "high protein" diet is the most common diet that Americans follow, and consumers use "good source of protein" as the top criterion to define a healthy food.[5]

21.    This ballooning demand is fostered in part by the rapid adoption of GLP-1 drugs for weight loss or disease management.  As of late 2025, approximately 1 in 8 U.S. adults is taking a GLP-1 drug, and this number is projected to rise.[6]  These medications reduce appetite, so consumers are reaching for nutrient-dense foods that deliver more nutrition in smaller portions.[7]  As one healthcare provider put it, "if you're only able to eat 50% [of what you normally would], you should make every bite as nutritious as possible."[8]  Providers instruct patients to "prioritize protein" when taking the drugs.[9]  High-protein diets enable patients to

---

[2] Da Eun Kim et al., *Added Protein, Added Value? Consumer Demand for Protein Labels Across Product Types, Flavors, and Consumer Segments*, 139 Food Quality & Preference, May 2026, at 1.

[3] Julian Mellentin, *Dairy Protein Is the Trend of the Decade*, Arla Foods Ingredients, https://www.arlafoodsingredients.com/the-whey-and-protein-blog/trends/dairy-protein-trend-of-the-decade/.

[4] *Americans' Perceptions of Protein*, Int'l Food Information Council (July 2025), https://ific.org/wp-content/uploads/2025/07/IFIC-Spotlight-Survey-Protein-Perceptions.pdf;  Libby Hargreaves, *High-Protein Yoghurt: Danone's Supply Chain Answer to GLP-1*, SupplyChainDigital (Feb. 20, 2026), https://supplychaindigital.com/news/protein-yoghurt-danone-supply-chain-answer-glp-1.

[5] *Americans' Perceptions of Protein*, *supra*.

[6] News Release, KFF.org, Poll:  1 in 8 Adults Say They Are Currently Taking a GLP-1 Drug for Weight Loss, Diabetes or Another Condition, Even as Half Say the Drugs Are Difficult to Afford  (Nov. 14, 2025), https://www.kff.org/public-opinion/poll-1-in-8-adults-say-they-are-currently-taking-a-glp-1-drug-for-weight-loss-diabetes-or-another-condition-even-as-half-say-the-drugs-are-difficult-to-afford/.

[7] Emily Wenerstrom, *High-Protein Trend Strengthens Dairy Market*, Food Bus. News (Mar. 20, 2026), https://www.foodbusinessnews.net/articles/30026-high-protein-trend-strengthens-dairy-market.

[8] Todd Neff, *Many People Using GLP-1 Weight Loss Drugs May Not Be Eating Enough Nutritious Food*, UCHealth (May 19, 2025), https://www.uchealth.org/today/nutrition-vital-when-taking-glp-1-weight-loss-drugs/.

[9] *Id.*

maintain and build muscle during weight loss.

22.     Significant policy changes are driving increased protein demand, too. In January 2026, the U.S. Departments of Health and Human Services and Agriculture released the *Dietary Guidelines for Americans* for 2025–2030.[10]  The updated Guidelines materially shifted the recommended macronutrient composition of their daily calorie intake.  In particular, the Guidelines recommend increasing protein intake by 50 to 100%, depending on body weight, without also increasing calories.[11]  That change in guidance has increased demand for foods that are high in protein yet relatively low in calories.

23.     At the supermarket, consumers chiefly evaluate a food's protein content by consulting the number of grams of protein that are present in a single serving.[12]  As noted above, Chobani's own research confirms that 74% of consumers "prioritiz[e] . . . [the] amount of protein . . . per serving" when selecting foods.[13]

24.     Twenty grams of protein per serving has emerged globally as a crucial consumer baseline for protein content.[14]  Consumer demand for at least 20 grams of protein per serving is reflected throughout the supermarket, including in the dairy aisle, with Chobani and other companies offering products from macaroni and cheese to toaster pastries that explicitly reference that threshold:

---

[10] U.S. Dep't of Health & Hum. Servs. & U.S. Dep't of Agriculture, *Dietary Guidelines for Americans, 2025–2030*, https://cdn.realfood.gov/DGA.pdf.

[11] Andrea Alexander, *What You Need to Know About the New Dietary Guidelines*, Rutgers (Jan. 22, 2026), https://www.rutgers.edu/news/what-you-need-know-about-new-dietary-guidelines.

[12] *Americans' Perceptions of Protein*, *supra*.

[13] *Americans Are Prioritizing Protein Now More Than Ever*, *supra*.

[14] Hargreaves, *supra*; *see* Lauren Sabetta, *Protein Flexes Its Muscles as Consumers Look to Add More Protein to Diet*, Beverage Indus. (Oct. 22, 2024) ("In the beverage space, 20 grams of protein is now a common threshold . . . [for] a single serving."), https://www.bevindustry.com/ articles/97003-protein-flexes-its-muscles-as-consumers-look-to-add-more-protein-to-diet.



***Figure 1.*** *Examples of foods and beverages touting 20 grams of protein per serving*

25.     Protein content also drives greater spending. Products with a high-protein label claim can command a price premium up to 12%.[15]

26.     These dynamics have shifted market patterns across the food and beverage industry—particularly in the dairy sector. From 2021 to 2024, yogurt sales increased by 28%.[16] This growth has been even more pronounced for products with high dairy-protein content: U.S. supermarket sales of such products grew by 17% in 2024 alone.[17]

27.     Chobani is keenly aware of this rising consumer demand, as well as the related gaps in consumer understanding. As noted above, in December 2024, Chobani released survey results showing that, while 85% of Americans "are prioritizing protein now more than ever," they also "lack knowledge" around protein consumption and face multiple "barriers to entry."[18]

---

[15] Corey Geiger et al., *Dairy Poised to Help Meet Consumers' Growing Demand for Protein*, Cobank (Jan. 23, 2026), https://www.cobank.com/web/cobank/knowledge-exchange/dairy/dairy-poised-to-help-meet-consumers-growing-demand-for-protein (citing Circana market research).

[16] Corey Geiger et al., *Dairy Products Have More Growth Potential*, Cobank (July 2024), https://www.cobank.com/documents/7714906/7715329/KED-Report-DairyCPG-Jul2024.pdf/.

[17] Mellentin, *supra*.

[18] *Americans Are Prioritizing Protein Now More Than Ever*, *supra*.

Chobani therefore knows that, when it comes to protein, consumers rely on brands to make truthful, nondeceptive claims to enable them to make the right purchase decisions.

28.    On information and belief, Chobani has tried and failed to manufacture dairy products that could legitimately compete in the ultra-high-protein category. In February 2022, Chobani launched its "Ultra-Filtered Milk" product, which touted "20G Protein" on the front label.[22]  It discontinued that product just three months later,[19] following consumer feedback that the milk was "horrible," "thick," "syrupy," "sour," and like "goo."

## B.  Regulatory Background

29.    Since 1993, regulations promulgated by FDA have provided a standardized basis for determining serving sizes on product labels—and, accordingly, the denominators for per-serving nutrient-content claims.

30.    At the time it enacted these regulations, FDA recognized that standardization of serving sizes was necessary to "reduce [consumer] confusion"[20] and ensure that food label claims "are not misleading to consumers."[21] According to the House Report that prompted these regulations, the non-standardized serving-size information previously provided by manufacturers was "extremely misleading," since consumers had no objective way to compare different products and determine which one was actually more nutrient-dense.[22] FDA's goal in adopting these regulations was to ensure that nutrition claims "were the result of the characteristics of the food and *not* of manipulation of the serving size."[23]

---

[19] Elaine Watson, *Chobani Discontinues Ultra-Filtered Milk Three Months After Launch*, FoodNavigatorUSA (Apr. 26, 2022), https://www.foodnavigator-usa.com/Article/2022/04/26/ Chobani-discontinues-ultra-filtered-milk-three-months-after-launch/.

[20] 58 Fed. Reg. 2235–36 (Jan. 7, 1993).

[21] 56 Fed. Reg. 60421-01 (Nov. 27, 1991).

[22] 58 Fed. Reg. 2235–36 (quoting H. Rep. 101-538, 101st. Cong., 2d sess. 18 (1990)).

[23] 56 Fed. Reg. 60421-01 (emphasis added).

31.     To implement serving-size standardization, FDA determined "reference amounts customarily consumed" ("RACC") for numerous foods, which signify the amount of a given food typically eaten in one sitting.  For yogurt, the RACC is 170 grams.[24]  Notably, the RACC is *not* the same thing as the serving size—but it does play a critical role in calculating serving sizes.

32.     Under FDA regulations, the serving size that must be declared for a given product depends on whether the product is packaged in a single-serving container or a multiple-serving container—which, in turn, depends on the RACC.  This system affords manufacturers "relatively little discretion" in determining serving sizes, especially for multiple-serving containers.[25]

33.     If a product is packaged and sold individually, and contains less than 200% of the applicable RACC, the declared serving size must be the contents of the entire container.[26]  Stated otherwise, containers with less than 200% of the applicable RACC are deemed to be single-serving containers, and the serving size is simply whatever the container holds.

34.     If a product contains 200% or more of the applicable RACC, it is deemed a multiple-serving container.  The serving size for a multiple-serving container must be expressed in terms of the relevant "common household measure"— cups, tablespoons, etc.[27]

---

[24]   21 C.F.R. § 101.12. The 170 gram RACC for yogurt was set in May 2016. *See* 81 Fed. Reg. 34000–01 (May 27, 2016). This RACC for "yogurt" applies to the Chobani Yogurt.  FDA has directed that the "product categor[ies]" in its RACC regulation encompass products with "similar dietary usage," and that "substitute[s]" or "altered versions" of products specified in the RACC regulation "must [use] the same [RACC] as that of the regular counterpart food." 56 Fed. Reg. 60394-01, 1991 WL 250814 (Nov. 27, 1991); 21 C.F.R. § 101.12(d).

[25] 58 Fed. Reg. 2230.

[26] 21 C.F.R. § 101.9(b)(3), (6); *see* FDA, *Food Labeling: Serving Sizes of Foods That Can Reasonably Be Consumed at One Eating Occasion, Reference Amounts Customarily Consumed, Serving Size-Related Issues, Dual-Column Labeling, and Miscellaneous Topics: Guidance for Industry* (Dec. 2019), https://www.fda.gov/media/133699/download.

[27] 21 C.F.R. § 101.9(b)(5).

For yogurt, that "common household measure" is the cup.[28]

35.     To determine the applicable serving size, manufacturers must take the relevant RACC (for yogurt, 170 grams) and determine how many cups that amount of yogurt equates to. If the resulting amount lies between two whole numbers, it must be rounded to the nearest ¼ cup or 1/3 cup (i.e., ¼, 1/3, ½, 2/3, ¾). [29] For example, if 170 grams of a particular yogurt product equates to exactly 0.72 cups, then the closest permitted increment is ¾ (0.75) cup, and the serving size must therefore be declared as ¾ cup.

36.     On the label of a multiple-serving product, the declared serving size (in cups) must be followed in parentheses by "the equivalent metric quantity" (in grams).[30] Importantly, this "equivalent metric quantity" is not the RACC itself; it is the rounded-off serving size (in cups) converted back to grams.[31] The "equivalent metric quantity" should equal the RACC of 170 grams only if 170 grams of a given yogurt product happens to take up a volume (in cups) that is an exact 170 grams. Otherwise, the "equivalent metric quantity" will differ from the multiple of ¼ or 1/3 RACC because of rounding. FDA considers this "equivalent metric quantity" to be the "actual amount of product per serving" used to calculate per-serving nutrient amounts in a product's Nutrition Facts panel and in any front-of-package nutrient-content claims.[37]



RACC (grams) → Common household measure (cups) → Round to nearest 1/3 or ¼ cup → Equivalent metric quantity (grams) → Calculate nutrition claims

---

[28] *Id.* § 101.12 tbl.2.
[29] *Id.* § 101.9(b)(5)(i), (ix).
[30] *Id.* § 101.9(b)(7).
[31] *Id.*

*Figure 2.* *FDA-mandated calculation process for multile-serving containers*

### C.  Chobani's Deceptive Product Naming, Labeling, and Advertising

37.     Mindful of the market trends discussed above, Chobani has attempted to compete for and attract consumers seeking at least 20 grams of protein per serving.  But instead of investing the resources into developing a higher protein-rich yogurt to meet the 20 gram per serving threshold, Chobani has chosen to pass off a less protein-dense product as a more protein-dense one by manipulating its serving sizes.

38.     The Chobani Yogurt's labeling and packaging predominately, uniformly, and consistently states the Product contains 20 grams of protein per serving. However, it contains a significantly lower amount of protein per serving than represented on the product packaging.

39.     The representations that the Chobani Yogurt contains 20 grams of protein per serving were uniformly communicated to Plaintiff and every other person who purchased the Chobani Yogurt. Each of the Chobani Yogurt containers include a label representation regarding the amount of protein per serving.

40.     By way of example, the same or substantially similar Chobani Yogurt label appeared on each product during the entirety of the Class Period:

11





41.    As described in detail herein, Defendant's protein claims, which advertise the Products as containing and providing 20 grams of protein per serving, are unlawful and deceptive in that the Products misrepresent the amount of protein per serving in the Products.

**D. Federal Regulations Governing Food Labeling**

42.    Federal laws regulate the content of labels on packaged food. The requirements of the FDCA and its labeling regulations are applicable nationwide to all sales of packaged food products. Additionally, none of the state laws sought to be enforced here impose different requirements on the labeling of packaged food for sale in the United States.

43.    The FDCA provides that a food is misbranded if "its labeling is false or misleading in any particular."[32] This requirement parallels state consumer protection laws, which prohibit false and misleading advertising. But, the FDCA's prohibition is also adopted by states in their own parallel food labeling laws, such as the New York State Agriculture and Markets Law § 201 ("Food shall be deemed to be misbranded: 1. if its labeling is false or misleading in any particular…."), California Sherman Food, Drug, and Cosmetic Law. Cal. Health & Safety Code § 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.") and the Illinois Food, Drug and Cosmetic Act, 410 ILCS 620/11 ("A food is misbranded [i]f its labeling is false or misleading in any particular").

44.    21 C.F.R. § 101.13(i)(3), prohibits manufacturers from making a claim on a product's package about the "amount or percentage of a nutrient," such as protein, if the statement is "false or misleading in any respect." If it is, then "it may not be made on the label."[33] This is true even if the same amount appears in the nutrition facts panel.[34]

---

[32] 21 U.S.C. § 343(a)
[33] 21 C.F.R. § 101.13(b).
[34] 21 C.F.R. § 101.13(c).

45.     Under the FDCA, the term "false" has its usual meaning of untruthful, while the term "misleading" is a term of art that covers labels that are technically true but are likely to deceive consumers.

**E.  Defendant's Marketing and Labeling of the Products Independently Violates Federal and State Law**

46.     Defendant's Products are unlawful, misbranded, and violate state and federal law. Defendant misrepresents the amount of protein per serving. Defendant's failure to comply with this requirement renders the label protein claims on each Product unlawful *per se* and the Products misbranded pursuant to §§ 101.13(n) and (b), as well as under § 101.9(c)(1), and parallel state law.

47.     As noted herein, the amount of protein in food products is material to consumers. Accordingly, misrepresenting the total amount of protein per serving is deceptive and misleading, rendering Defendant's Product labels literally false. Indeed, Defendant represents the Products contain 20 grams of protein per serving, when in fact it contains significantly less.

48.     Defendant violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. § 101.9(c)(1-2), which were implemented to prevent the false and misleading conduct described herein. These federal food regulations are also incorporated into several states' food laws, including in New York.[35] These are not just technical violations of food labeling law, but serious misrepresentations that harm both consumers and competition.

49.     A reasonable consumer would expect the Products to contain what Defendant claims on the Product labels and that the labels would not be contrary to the policies or regulations

---

[35] *See* N.Y. Agric. & Mkts. Law § 214-b. (McKinney) ("[t]his article and the regulations promulgated thereunder shall be so interpreted and construed, however, as to effectuate its general purpose to enact state legislation uniform with the federal act approved June twenty-fifth, nineteen hundred thirty-eight, and all acts amendatory thereof and supplemental thereto.").

of FDA and advertised in violation of New York law.

50.     Chobani's multiple-serving containers contain 32 ounces of yogurt. This format bears the prominent "20G Protein" claim as part of the Chobani Product's name, as well as a declaration of "20g" protein "per serving[]" in   the Nutritional Facts Panel ("NFP").   This claim is based on a serving size that is false, misleading, and unlawfully calculated.

51.     To see why, a bit of arithmetic is required.  Chobani declares that ¾ (0.75) cup of the Chobani Product weighs 190 grams.  Accordingly, 170 grams of this product—the RACC for yogurt—equates to just 0.671 cups of product.



| Serving Size | 3/4 cup (190g) |
|---|---|
| Calories | 140 |
| Serving Per Container | About 5 |
| Amount per servings | %DV* |
| Total Fat 3g | 4% |
| Saturated Fat 2g | 10% |
| Trans Fat 0g | - |
| Cholesterol 20mg | 7% |
| Sodium 100mg | 4% |
| Total Carbohydrate 9g | 3% |
| Dietary Fiber 2g | 7% |
| Total Sugars 7g | - |
| Includes 0g Added Sugars | 0% |
| Protein 20g | 40% |

**Figure 3.** *Chobani 20G Protein 32-ounce vanilla yogurt Nutrition Facts*

52.     For its multiple-serving container, Chobani should have, pursuant to the aforementioned FDA regulation, taken 0.671 cups and rounded it to the nearest multiple of ¼ or ½ cup to determine its declared serving size.  That nearest multiple is ½ (0.667) cup.  The correct serving size would therefore be ½  cup, and the "equivalent metric quantity" used to calculate per-serving nutrition facts and claims would be 168.9 grams.

53.     Using  the  correct  ½  cup  serving  size  and  the  correct  "equivalent  metric quantity" of 168.9 grams, the Chobani Product contains only 17.78 grams of protein per serving,

15

which FDA regulations permit to be rounded to 18 grams on the product label.



*Figure 4.* *Standardized, FDA-mandated calculation process for 32-ounce Chobani 20G Protein Vanilla Yogurt*

54.     However, contrary to this regulation, Chobani uses ¾ (0.75) cup for its serving size. That is **not** the closest multiple of ¼ or ⅓ for the Chobani product. Instead, it is improperly inflated. Chobani then uses that inflated serving size to calculate an incorrect "equivalent metric quantity" of 190 grams, as reflected on its label.

55.     In other words, Chobani overstates its FDA-mandated serving size, and the resulting "equivalent metric quantity," by approximately 12.5%. That means Chobani's per-serving nutrition facts and claims—including its protein-per-serving claim—are also overstated by about 12.5%.



*Figure 5.* *Chobani's misleading calculation process with wrongful acts in red*

56.     Chobani mislabels both the plain and vanilla-flavored varieties of the 32-ounce multiple-serving Chobani Product in the same manner.

57.     As alleged above, 20 grams per serving is a well-established psychological anchor point for consumers interested in maximizing protein intake. Accordingly, through its deceptive labeling, Chobani misleads consumers to think that the Chobani Product's protein

density meets that threshold, when it does not. Chobani knows that if it had lawfully calculated its serving size and nutritional values, it could truthfully label the multiple-serving container of the Chobani Product as containing only *18 grams* of protein per serving, below the important 20-gram threshold. Chobani, moreover, could not use the product name "20G Protein" for the multiple-serving container of the Chobani Product.

58.     As a result of Chobani's deceptive conduct, 32-ounce tubs of the Chobani Product are placed in grocery stores alongside 32-ounce tubs of other yogurt products that comply with FDA's serving-size regulations. That placement creates a contextual inference that misleads consumers to believe that the products' protein claims are directly comparable, when in fact they are not.

59.     Chobani knows that shoppers engage in this precise type of comparison. FDA has expressly recognized that serving sizes for multi-serving food products must be standardized so that consumers can "compare the nutritional value of foods that," like yogurts manufactured by different companies, "are used interchangeably in the diet."[36]

60.     Consumers expect that competing food companies follow the same rules when making nutrition claims. When a manufacturer touts the per-serving protein content of its multi-serving yogurt product, consumers understand and expect that there is a standardized serving size for multi-serving yogurt products that all manufacturers employ when making such claims, and that the brand calculated the amount of protein per serving based on that standard serving size.

61.     Upon information and belief, one of Chobani's competitors, Danone US,

---

[36] 56 Fed. Reg. 60394-01.

recently commissioned a survey from a well-qualified expert survey vendor to test this proposition. A total of 320 U.S. consumers who purchase yogurt and deem protein important to their purchase decisions were shown side-by-side images of the Chobani Product and Oikos Pro, both in 32-ounce multiple-serving containers. They were then asked: "Based on the information you saw on the packages, which of the following statements best describes how you would expect the amount of protein per serving in these products is calculated?" They were presented with these options:

a. There is a standardized serving size, and both brands calculate the amount of protein per serving based on that standard serving.

b. There is a standardized serving size, but only one brand calculates the amount of protein per serving based on that standard serving, while the other does not.

c. There is no standardized serving size. Each brand can choose any serving size they wish.

d. I don't have an expectation about this / don't know.

Two-thirds of the survey respondents (66.6%) gave response (a): "There is a standardized serving size, and both brands calculate the amount of protein per serving based on that standard serving."

62.     This shows decisively that consumers who view the Chobani Product alongside Danone US's products in the marketplace expect that both manufacturers are playing by the same rules when calculating and making statements about per-serving protein content. Chobani's wrongful conduct described above flouts those reasonable expectations.

63.     In addition to its deceptive and unlawful product naming and labeling, Chobani prominently advertises the Chobani Product as containing "20 grams of protein" per serving—further reinforcing the deception created by the product's name and label.

64.     For example, Chobani's website states that the Chobani Product is "packed with

18

20g of complete protein to help keep you full and focused."[40]

> Chobani® High Protein Greek Yogurt is thick, creamy, and packed with 20g of complete protein to help keep you full and focused. Made with real fruit, only natural ingredients, and a boost of B12 to unlock natural energy—one spoonful at a time.

***Figure 6.*** *Chobani High Protein Greek Yogurt website*

65.    Chobani's online ads, available on YouTube and social media sites, prominently feature the "20 grams of protein" claim in their imagery and voiceovers.

66.    One Chobani Instagram post asks: "How do we naturally get 20g of protein in our High Protein Greek Yogurt . . . ?" It answers that question by touting Chobani's "straining process," which purportedly "allows [Chobani] to concentrate the protein content," "resulting in more protein per serving."[37]



***Figure 7.*** *Chobani Instagram post*

67.    Chobani makes these "20 grams" claims not just for the Chobani Product

---

[37] *High Protein Greek Yogurt*, Chobani, https://www.chobani.com/innovation/highprotein greek yogurt.

*generally*, but also for the 32-ounce multiple-serving format *specifically*.[38]   For example, Chobani's website depicts the 32-ounce multiple-serving Chobani Product with the marketing claim "Feel full with 20g of protein," linked by an asterisk to the phrase "Per Serving":



**Figure 8.**  *Chobani High Protein Greek Yogurt Lowfat Plain website*

68.    Likewise, Chobani's Instagram and Facebook posts introducing the 32-ounce multi-serving version of the Chobani Product said: "Introducing a new way to love Chobani: 20G Vanilla Greek Yogurt now comes in a 32oz multi-serve tub, which is equal to about 5 of our single-serve cups."



---

[38] Video posted by Chobani(@Chobani), Instagram, *How Do We Naturally Get 20g of Protein in Our High Protein Greek Yogurt* (Feb. 27, 2026), https://www.instagram.com/reel/DVRIic 5kcGw/?igsh=aXlvZ2pzNTZ5cTRv.

*Figure 9.* *Chobani Instagram post*

69.     None of these websites, postings, or advertisements discloses that *only* the single-serving Chobani Product actually contains "20 grams" of protein per serving when calculated in the manner required by FDA regulations, or that the multiple-serving Chobani Product actually contains *just 17.78 grams* of protein per serving when properly calculated according to the standardized method that reasonable consumers expect.

70.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. They would not know the true amount of protein per serving the Products provide merely by looking elsewhere on the Products. Its discovery requires investigation well beyond the grocery store aisle and knowledge of food chemistry beyond that of the average consumer.

71.     An average consumer does not have the specialized knowledge necessary to ascertain that a serving of the Products does not provide the amount of protein per serving that is represented on the labels. The average reasonable consumer has no reason to suspect that Defendant's representations on the Products' labels are misleading. Therefore, consumers have no reason to investigate whether the Products actually do contain the amount of protein per serving that the Products' labels claim. Nor do consumers have a way to prevent their injury. Instead, consumers reasonably rely on Defendant's representations regarding the nutritional contents of the Products.

72.     Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the product packaging, as Defendant does with the claims on the Products' labels regarding specific

21

amounts of protein per serving.

73.    Defendant continues to market its Products with the demonstrably false protein grams per serving claims. Accordingly, consumers continue to be harmed by Defendant's fraudulent business practices. Because consumers are unable to confirm the accuracy of the nutritional labeling on Defendant's Products before purchasing them, they are unable to determine if Defendant's fraudulent business was correct, or if Defendant still misrepresents its Products' protein per serving content.

74.    Defendant intended for Plaintiffs and the Class Members to be deceived or misled. Defendant's deceptive and misleading practices proximately caused harm to the Plaintiffs and the Class.

75.    Because consumers pay a premium for products that provide more protein per serving, Defendant is able to both increase its sales and retain more profits.

## PLAINTIFF'S EXPERIENCES

76.    Plaintiff Hale Knox purchased 32-ounce Chobani Yogurt several times during the course of the last 6 years from various retailers in New York, New York such as Stop and Shop. Plaintiff's most recent purchase of Chobani Yogurt was within the last few months prior to the filing of this lawsuit.

77.    Plaintiff Hale Knox made each of his purchases after reading and relying on Defendant's Product labels that promised the Products provided a specific number of grams of protein per serving. He believed the truth of each representation, *i.e.*, that the Products would actually provide the specific amount of protein per serving on the labels. Had Defendant complied with the law and stated the correct amount of protein per serving on the Products' labels, he would not have been drawn to the Products and would not have purchased them. At a minimum, Hale

Knox would have paid less for each Product.

78.    Moreover, had Defendant followed FDA regulations and adequately disclosed the correct number of grams of protein per serving for each Product expressed, Plaintiff would not have purchased the Products or would have, at minimum, paid less for them.

79.    Plaintiff checks the NFP before purchasing products for the first time, and he uses that information as a basis of comparison between similar products. He looked at and read the NFP on the Products before purchasing them for the first time. He especially looks at the protein per serving content on the NFP.

80.    Plaintiff continues to desire to purchase products that contain 20 grams of protein per serving, including those marketed and sold by Defendant. Plaintiff would like to purchase products that provide the protein content per serving correctly as advertised. If the Products or the labels were reformulated to provide non-misleading information, Plaintiff would likely purchase them again in the future.

81.    Plaintiff and members of the Class were economically damaged by their purchases of the Products because the advertising for the Products was, and remains, untrue and/or misleading under state law and the Products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

### FED. R. CIV. P. 9(b) ALLEGATIONS

82.    Although Defendant is in the best position to know what content it placed on its Product packaging, on its website(s), and on the websites of retailers of the Products during the relevant timeframe, and the knowledge it had regarding the protein content per serving in the Products, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the

23

following facts with particularity:

83.    **WHO**: Defendant made material misrepresentations of fact through its Products' packaging regarding the protein per serving content in its 32-ounce Chobani Yogurt Products.

84.    **WHAT**: Defendant's conduct was, and continues to be, fraudulent because it misrepresented the number of grams of protein per serving in the Products, a fact that Defendant knew, or should have known, to be false, but nonetheless marketed, and continues to market, the Products as containing a specific number of grams of protein per serving content without disclosing or adjusting the Products' correct content in the NFP. Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the Products contained more protein content per serving than the amount represented on the Products' labels. Defendant knew, or should have known, this information is material to reasonable consumers—including Plaintiffs and Class Members—in making their purchasing decisions, yet it continued to pervasively market and label its Products as containing more protein content than the Products actually contained per lawfully-calculated serving.

85.    **WHEN**: Defendant made material misrepresentations during the putative class periods and at the time Plaintiffs and Class Members purchased the Products, prior to and at the time Plaintiffs and Class Members made claims after realizing the Products did not contain the represented protein per serving content, and continuously throughout the applicable class periods.

86.    **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations on the Products' labeling and packaging, its website(s) and the websites of retailers of the Products.

87.    **HOW**: Defendant made material misrepresentations of material facts regarding the Products, including, but not limited to, the amount of protein per serving content in the Products.

24

88.    **WHY**: Defendant made the material misrepresentations detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay a premium price for the Products, the effect of which was Defendant profited by selling the Products to many thousands of consumers.

89.    **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations.

**CLASS ALLEGATIONS**

90.    Plaintiff Hale Knox brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3), on behalf of themselves and the members of the following classes:[39]

(a)    **Nationwide Class**: During the fullest period allowed by law, all person who purchased Defendant's 32-ounce 20G Protein Yogurt Products for personal use and not resale within the United States; and

(b)    **New York Class**: During the fullest period allowed by law, all persons who purchased Defendant's 32-ounce 20G Protein Yogurt Products for personal use and not resale within the State of New York.

91.    Excluded from these class definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the Class

---

[39] Unless otherwise specified, all references in this Complaint to "Classes" or the "Class" refer collectively to the Nationwide Class and New York Class.

definition, as necessary.

92.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

93.    **Numerosity:** Plaintiffs do not know the exact size of the Class but estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of its claims in a class action rather than in individual actions will benefit the parties and the courts.

94.    **Common Questions Predominate:** This action involves common questions of law and fact to the potential Class because each Class Member's claim derives from the deceptive, unlawful, and/or unfair statements and omissions that led consumers to believe that the Products contained the amount of protein per serving content represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Classes are:

    a.    Whether the marketing, advertising, packaging, labeling and other promotional materials for the Products are misleading;

    b.    Whether Defendant's actions violate the consumer protection laws invoked herein;

    c.    Whether labeling the Products with false protein per serving content claim causes the Products to command a price premium in the market;

    d.    Whether Defendant's failure to provide a statement of the correct amount of protein per serving in the Products was likely to deceive reasonable consumers;

    e.    Whether Defendant engaged in the challenged behavior knowingly, recklessly or

negligently;

f.   The profits and revenues Defendant earned as a result of the conduct;

g.   Whether Class Members are entitled to restitution, injunctive, and other equitable relief and, if so, what is the nature (and amount) of such relief; and

h.   Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

95.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Class were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

96.    **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in Plaintiffs' best interests to prosecute the claims alleged herein to obtain full compensation due to Plaintiffs for the unfair and illegal conduct of which Plaintiffs complain. Plaintiffs also have no interests that conflict with, or are antagonistic to, the interests of the Class. Plaintiffs retained highly competent and experienced class action attorneys to represent Plaintiffs and the interests of the Class. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all members of the Class. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to litigate this class action adequately and vigorously. Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

97.     **Injunctive/Declaratory Relief**: The elements of Rule 23(b)(2) are met. Defendant will continue to commit the unlawful practices alleged herein and Class Members will remain at an unreasonable and serious risk of repeated harm. Defendant acted, or refused to act, on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate with respect to the Class as a whole.

98.     **Superiority:** There is no plain, speedy or adequate remedy other than by maintenance of this class action. Individual actions by members of the Class seeking individual remedies will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

99.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

100.     Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations are separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes

of action:

## COUNT I

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### NY General Business Law §§ 349, *et seq.*
### *(On behalf of Plaintiff Hale Knox , individually and on behalf of the New York Subclass)*

101.    Plaintiff Hale Knox, individually, and on behalf of the New York Class, re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

102.    The New York General Business Law ("GBL") § 349, prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ." GBL § 349(a).

103.    The practices alleged herein—namely, deceiving customers into believing that the Products contain the amount of protein per serving content listed on the Product's label—are unfair, deceptive, and misleading in violation of GBL § 349.

104.     The foregoing deceptive acts and practices were directed at Plaintiff and other members of the Class.

105.    Defendant's misrepresentations, including its prominent labeling on the Products regarding the amount of protein per serving content the Products contain, are material to a reasonable consumer. A reasonable consumer attaches importance to such representations and is induced to act thereon in making purchasing decisions.

106.    Plaintiff and members of the Class were injured as a direct and proximate result of Defendant's unlawful acts as they would have paid less for Defendant's Products but for Defendant's material misrepresentations regarding the amount of protein per serving in the Product, as described in this Complaint.

107.    As a result of Defendant's unlawful actions, Plaintiff and members of the Class seek to enjoin Defendant's deceptive and unlawful acts and practices described herein; to recover

29

the greater of their actual damages or fifty dollars ($50.00) per violation; and to recover treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## COUNT II

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### NY General Business Law §§ 350, *et seq.*
### *(On behalf of Plaintiff Hale Knox, individually, and on behalf of the New York Subclass)*

108.    Plaintiff Hale Knox, individually, and on behalf of the New York Class, re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

109.    GBL § 350 provides in relevant part: "False advertising in the conduct of any business, trade or commerce . . . in this state is hereby declared unlawful."

110.    In turn, GBL § 350-a defines false advertising as:

advertising, including labeling, of a commodity...if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity...to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

111.    Defendant's representations regarding the amount of protein per serving in the Products listed on the Product's label, are untrue and materially misleading and deceive consumers into believing the Products contain 20 grams of protein per serving, substantially more than the Products actually possess, as detailed herein.

112.    Defendant's misrepresentations regarding the amount of protein per serving in the Products are material to a reasonable consumer. A reasonable consumer attaches importance to such representations and is induced to act thereon in making purchase decisions.

113.    Plaintiff and the Class Members were induced to purchase the Products by Defendant's misrepresentations on the Product's labels.

30

114.    Plaintiff and members of the Class were injured as a direct and proximate result of Defendant's unlawful acts as they would have paid less for the Products but for Defendant's material misrepresentations regarding the amount of protein per serving, as described in this Complaint.

115.    As a result of Defendant's unlawful actions, Plaintiff and members of the Class seek to enjoin Defendant's misleading and unlawful acts and practices described herein; to recover the greater of their actual damages or five hundred dollars ($500.00) per violation; and to recover treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

**COUNT III**
**UNJUST ENRICHMENT**
*(On behalf of the Plaintiff, individually, and on behalf of the Nationwide Class and, in the alternative, the New York Subclass)*

116.    Plaintiff, individually, and on behalf of the Nationwide Class, and in the alternative the New York Class, re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

117.    At all times relevant hereto, Defendant deceptively marketed, advertised and sold merchandise to Plaintiff and the Classes.

118.    Plaintiff and the Classes conferred upon Defendant non-gratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiff and the Classes, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and the Classes were not receiving a product of the quality, nature, fitness or value that had been represented by Defendant and reasonable consumers would have expected.

119.    Defendant was unjustly enriched in retaining the revenues derived from purchases of merchandise by Plaintiffs and the Classes, which retention under these circumstances is unjust

31

and inequitable because Defendant falsely represented that the Products contained a specific protein content per serving, while failing to disclose that the Products actually provided a much protein content per lawfully-calculated serving than represented, which caused injuries to Plaintiffs and the Classes because they paid a price premium due to the misleading advertising and markings on the Products.

120.    Retaining the non-gratuitous benefits conferred upon Defendant by Plaintiff and the Classes under these circumstances made Defendant's retention of the non-gratuitous benefits unjust and inequitable. Thus, Defendant must pay restitution and non-restitutionary disgorgement of profits to Plaintiff and the Class Members for its unjust enrichment, as ordered by the Court. Plaintiff, and those similarly situated, have no adequate remedy at law to obtain this restitution.

121.    Plaintiff, therefore, seek an order requiring Defendant to make restitution and non-restitutionary disgorgement of profits to Plaintiff and other members of the Class.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of other members of the proposed Classes, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

    A.    Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

    B.    Ordering payment of actual and punitive damages;

    C.    Ordering payment of statutory damages pursuant to N.Y. Gen. Bus. Law §§ 349(h) and 350-d(1);

    D.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the

other members of the Class;

E.  Ordering Defendant to pay both pre- and post-judgment interest on any amounts

awarded; and

F.  Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: June 16, 2026

Respectfully submitted,
**SULTZER & LIPARI, PLLC**

By:  /s/ Jason P. Sultzer
Jason P. Sultzer, Esq.
Scott Silberfein, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
silberfeins@thesultzerlawgroup.com

Russell M. Busch
**BRYSON HARRIS SUCIU
& DEMAY PLLC**
11 Park Place, 3rd Floor
New York, NY 10007
Tel: (919) 926-7948
rbusch@brysonpllc.com

Nick Suciu III*
**BRYSON HARRIS SUCIU
& DEMAY PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (616) 678-3180
nsuciu@brysconpllc.com

James Ferraro
**THE FERRARO LAW FIRM**
600 Brickell Avenue, Suite 3800
Miami, FL 33131
Tel: (305) 375-0111
james@ferrarolaw.com

*Counsel for Plaintiff and the Class*

*\*Pro hac vice forthcoming*

33